# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Raymond L. Semler,                              Civil No. 09-0732 (ADM / SRN)
Aldridge Taylor

                    **Plaintiffs,**              **REPORT & RECOMMENDATION**

        v.

Cal Ludeman, Commissioner of
Department of Human Services, et al.,

                    **Defendants.**

---

     Raymond L. Semler and Aldridge Taylor, 1111 Highway 73, Moose Lake, Minnesota 55101, Pro Se

     Barbara E. Berg Windels and Jan M. Haapala, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 900, St. Paul, Minnesota 55105, for Defendants Ludeman, Tesneer, Benson, Carlson and Moser

     Angela Behrens, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 900, St. Paul, Minnesota 55105, for Defendants Hilleren and Fabian

---

SUSAN RICHARD NELSON, United States Magistrate Judge

     This matter comes before the undersigned United States Magistrate Judge on Plaintiffs' Motion for Preliminary Injunction (Doc. No. 5); Plaintiffs' Motion for Temporary Restraining Order (Doc. No. 41); Plaintiffs' Motion for Extension of Word Limit in Response to Defendants' Memorandum of Law in Support of Their Motion to Dismiss (Doc. No. 31); Plaintiffs' Motion to Remove Mail and Supplement Issue from State Court to Federal Court (Doc. No. 42); Plaintiffs' Motion to Voluntarily Dismiss Appeal (Doc. No. 43); Plaintiffs' Motion to Extend (Doc. No. 50); Motion to Dismiss brought by Defendants Ludeman, Tesneer, Benson, Carlson and Moser ("Ludeman Defendants") (Doc. No. 23) and Motion to Dismiss brought by Defendants Hilleren and Fabian ("Hilleren Defendants")(Doc. No. 36).  The matter has been referred to the

undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of

Minnesota Local Rule 72.1(a).

## I.    PROCEDURAL HISTORY

Plaintiffs, two patients civilly committed to the Minnesota Sex Offender Program

("MSOP") in Moose Lake, Minnesota, commenced this action pursuant to 28 U.S.C. § 1983,

against various state officials for violations of their constitutional rights.  As of the filing of the

Complaint, Plaintiffs resided at the MSOP Annex in Moose Lake.  (Complaint ¶ 56.)  The

Defendants include Cal Ludeman, the Commissioner of the Minnesota Department of Human

Services ("DHS"); MSOP employees Dennis Benson, Gregg Carlson, and Kevin Moser; and

Michael Tesneer, Chief Operating Officer of State Operated Services; Joan Fabian, the

Commissioner of the Minnesota Department of Corrections ("DOC"); and Dan Hilleren, MSOP

Warden.[1]  Plaintiffs seek declaratory and injunctive relief and unspecified compensatory and

punitive damages. (Complaint, Prayer for Relief, Doc. No. 1.)

In addition, Plaintiffs filed a Motion for a Preliminary Injunction (Doc. No. 5), claiming,

among other things, the threat of irreparable harm caused by double-bunking conditions at

MSOP, a "maximum security prison" atmosphere, excessively restrictive policies concerning

patient-run businesses, monetary transactions, searches, visitation, movement restrictions and

limitations on personal property, and other prison policies.  Also, Plaintiff Semler filed a Motion

for an Emergency Temporary Restraining Order related to the confiscation of certain legal

documents (Doc. No. 41.)  Finally, also pending before the Court are several procedural motions

filed by Plaintiffs, which the Court addresses herein.

Both sets of Defendants move to dismiss.  The "DHS Defendants" (Ludeman, Tesneer,

---

[1] Defendants are sued in their individual and official capacities.

Benson, Carlson and Moser) and the "DOC Defendants" (Fabian and Hilleren) argue the Complaint fails to state claims upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and that Plaintiffs fail to allege sufficient facts to sustain claims based on supervisory liability. Defendants also contend that they are entitled to immunity under the Eleventh Amendment.

## II.    FACTUAL HISTORY

As MSOP patients, Plaintiffs are committed to the custody of the Commissioner of DHS. (Complaint ¶ 1.)  DHS uses space within the Moose Lake campus of the Minnesota Correctional Facility to operate the MSOP.  (Complaint ¶ 30.)  MSOP provides treatment to persons committed by the courts as sexual psychopathic personalities or sexually dangerous persons under the Minnesota Commitment and Treatment Act.[2]  See Minn. Stat. § 246B.02; Minn. Stat. § 253B.

In their 81-count Complaint , Plaintiffs cite to numerous policies and procedures which they claim violate their constitutional rights.  In brief, Plaintiffs allege violations of the First Amendment, Fourth Amendment, Fourteenth Amendment and state and federal Statutes.

Specifically, Plaintiffs allege First Amendment violations including freedom of speech claims involving MSOP's media, mail and telephone policies (Complaint ¶¶ 9-11; 25-26; 12-16); access to courts/privacy claims involving procedures related to privileged legal mail and communication with the courts (Complaint ¶ 25; 48; 56; 58); privacy claims involving MSOP's restrictions on patient access to commercial suppliers of goods (Complaint ¶¶ 59, 60, 62); and

_____

[2] "Sexual psychopathic personalities" are persons whose conduct evidences an utter lack of power to control their sexual impulses, Minn. Stat. § 253B.02, subd. 18B, and "sexually dangerous persons" are persons who, because of their history and condition, are likely to engage in acts of harmful sexual conduct.  Minn. Stat. § 253B.02, subd. 18c.

freedom of association (Complaint ¶ 77).

Under the Fourth Amendment, Plaintiffs allege violations based on various types of searches of their persons and their rooms (Complaint ¶¶ 33-44; 63-64). Specifically, they challenge body searches requiring them to remove shoes and socks before and after gym use and following paid work assignments in the kitchen (Complaint ¶¶ 33-44), unclothed visual body searches after contact visits (Complaint ¶ 42), and random room searches (Complaint ¶ 63-64).

Plaintiffs allege a variety of claims under the Eighth Amendment as well. In particular, Plaintiffs challenge the following: a temporary practice that requires double-bunking and a related roommate selection process (Complaint ¶¶ 3; 52-55); a policy permitting the use of chemical irritants, including mace (Complaint ¶ 7); a prohibition on patient access to bleach (Complaint ¶ 5); a policy requiring that windows remain closed from October through April (Complaint ¶ 4); an inadequate response to an outbreak of the norovirus (Complaint ¶ 6); a policy allowing only one patient in the bathroom at a time following the 9:45 p.m. curfew (Complaint ¶ 3); the Protective Isolation Policy (Complaint ¶ 17); the Identification Count procedure (Complaint ¶ 18); and the safety of living conditions (Complaint ¶¶ 30, 67, 68).

Plaintiffs' procedural and substantive due process claims under the Fourteenth Amendment include challenges to a policy requiring MSOP visitors to submit application forms and undergo background checks prior to visiting (Complaint ¶ 8); restrictions on and damage to personal property (Complaint ¶¶ 19-24; 47-48; 50; 75); the belief that the new MSOP facility under construction will not have washing machines and other appliances and will enforce a patient dress code (Complaint ¶ 75); a policy permitting physical restraints (Complaint ¶ 65); and a claim that overall therapeutic treatment is ineffective (Complaint ¶ 69-72-74).

Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs allege that as

residents of the MSOP Annex, they are not granted as many work hours as MSOP patients who reside in the main building (Complaint ¶ 31-32); they also claim an equal protection violation for unclothed visual body searches (Complaint ¶ 42).

Plaintiffs allege violation of various state and federal statutes, including the Americans with Disabilities Act ("ADA") (Complaint ¶¶ 31-32); a statute limiting tort liability for state employees (Complaint ¶¶ 49-50); the Minnesota Patient Bill of Rights (Complaint ¶ 70); and a proposed state bill that would have taken a percentage of MSOP patient earnings and applied them to costs of confinement and to a victim crime fund (Complaint ¶ 32).

Finally, Plaintiffs allege miscellaneous claims without identifying the legal right that is infringed. For example, Plaintiffs allege that Defendants are reselling cable services to MSOP patients at a profit (Complaint ¶ 45); that facility equipment is broken and not repaired (Complaint ¶ 68); that recommendations made by the Hospital Review Board have been ignored by Defendants(Complaint ¶ 74); that facility violations identified in a DHS Order dated October 4, 2007, have not been corrected (Complaint ¶¶ 78-79); and that DHS charges patients for some portion of their care (Complaint ¶ 80).

## III.    DISCUSSION

### A.    Motions to Dismiss

The DOC Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs fail to state claims upon which relief can be granted. Specifically, the DOC Defendants contend that they cannot be liable for the policies and procedures of DHS and that to the extent the allegations indirectly implicate the DOC, Plaintiffs fail to state claims upon which relief may be granted. In addition, the DOC Defendants argue that the Eleventh Amendment bars claims for monetary damages and that dismissal is also

proper as there is no allegation of any personal involvement by the DOC.

The DHS Defendants also move to dismiss pursuant to Rule 12(b)(6). First, they note that many of Plaintiffs' allegations are not linked to any constitutional claims and, because some of the allegations do not involve Plaintiffs themselves, Plaintiffs lack standing to present the claims of other patients. In addition, the DHS Defendants contend that because some of the allegations concern the DOC, DHS cannot be held liable for the policies or procedures of the other state agency. Third, the DHS Defendants likewise argue that the Eleventh Amendment bars suit against Defendants sued in their official capacities. Fourth, they argue that supervisory liability claims against the DHS Defendants should be dismissed. Furthermore, the DHS Defendants contend that Plaintiffs' allegations fail to state claims for which relief can be granted under the First, Fourth, Eighth and Fourteenth Amendments. In addition, the DHS Defendants argue that Plaintiffs' claims for damages should be dismissed because they are entitled to qualified immunity. Finally, they maintain that the Court should decline supplemental jurisdiction over Plaintiffs' remaining claims.

In considering a Rule 12(b)(6) motion to dismiss, "we must assume that all the facts alleged in the complaint are true" and generally construe the complaint in the light most favorable to the plaintiff. E.g., Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994). "The complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal," DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002), and must contain enough facts to state a claim for relief "that is plausible on its face." Ashcroft v. Iqbal, __ U.S. __ (2009); 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Although pro se complaints, "however inartfully pleaded," are to be held "to less stringent standards than formal pleadings drafted by

lawyers," Haines v. Kerner, 404 U.S. 519, 520 (1972), "a district court should not assume the role of advocate for the pro se litigant," nor may a district court "rewrite a [complaint] to include claims that were never presented," Barnett v. Hargett, 174 F.3d 1128, 1133 (10th Cir. 1999) (quotations omitted), cited with approval in Palmer v. Clarke, 408 F.3d 423, 444 n.15 (8th Cir. 2005).

The Court may not consider materials outside the pleadings on a motion to dismiss. However, when considering a motion for judgment on the pleadings or a motion to dismiss under Rule 12(b)(6), a court may consider some materials that are part of the public record or do not contradict the complaint, Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir. 1999), cert. denied, 527 U.S. 1039 (1999), as well as materials that are "necessarily embraced by the pleadings." Piper Jaffray Cos. V. National Union Fire Ins. Co., 967 F.Supp. 1146, 1152 (D. Minn. 1997). See also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1357, at 199 (1990) (court may consider 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint'). Therefore, documents attached to the complaint may be reviewed on a motion to dismiss, since they are part of the pleading. See Fed. R. Civ. P. 10(c) (stating "a copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.") Thus, the Court will consider Plaintiffs' Complaint and the exhibits attached thereto in considering Defendants' motions to dismiss.

### 1.    Claims Relating to Other State Agencies

Both groups of Defendants argue that they cannot be held liable for policies and procedures established and implemented by the other agency. This especially applies to the DOC Defendants, as most of Plaintiffs' claims concern the policies and procedures of the

MSOP, which is administered by DHS.

The statute establishing the MSOP requires the Commissioner of Human Services to establish and maintain a secure facility located in Moose Lake. Minn. Stat. § 246B.02. The Commissioner of Human Services is further required by statute to adopt rules governing "the operation, maintenance, and licensure of secure treatment facilities operated by the Minnesota sex offender program, or at any other facility operated by the commissioner, for a person committed as a sexual psychopathic personality or a sexually dangerous person." Id., § 246B.04, subd. 1. The Minnesota Commitment and Treatment Act further permits the DHS Commissioner to limit the rights of patients committed to the program as sexually dangerous persons or sexual psychopathic personalities. Minn. Stat. § 253B.185, subd. 7. The Minnesota Legislature has established DHS as the administrator of MSOP and delegated to the Commissioner of Human Services the authority to establish procedures within the program. See Minn. Stat. §§ 246B.01, subd. 2 (defining "commissioner" as Commissioner of Human Services or Commissioner's designee). The DOC has no authority to establish policies or procedures affecting MSOP.

Some allegations in the Complaint appear to allege that certain MSOP policies and procedures are actually those of the DOC and that MSOP patients are either treated the same as, or worse than, DOC prison inmates. (See Complaint ¶¶ 12, 18, 25, 44, 62.) Plaintiffs, however, do not assert that the DOC is responsible for DHS's policies and procedures. Plaintiffs may not hold the DOC Defendants liable for actions attributable to DHS and it is therefore recommended that all such claims which purport to do so should be dismissed with prejudice.

To a lesser extent, the DHS Defendants argue that Plaintiffs fail to state claims against them which cite to DOC procedures, because DHS has no authority over DOC procedures and regulations. (See Complaint ¶¶ 28-29). It is therefore recommended that such claims likewise

be dismissed with prejudice, because DHS has no liability for the actions of the DOC.

## 2. Standing

As a preliminary matter, the party invoking federal jurisdiction bears the burden of establishing the elements of standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). To have standing, a plaintiff must demonstrate: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to speculative, that the injury will be redressed by a favorable decision. Id. at 560-61.

Several allegations in the Complaint do not allege injuries to Plaintiffs themselves, but to other patients. For example, the allegations in Paragraphs 15-17 concern another patient's dispute with the MSOP telephone policy; Paragragh17 describes another patient's complaint regarding protective isolation; Paragraph 35 refers to a gym policy as applied to an unnamed patient and a patient's medical treatment while in the gym; Paragraph 64 alleges unconstitutional searches of the rooms of unnamed patients (in addition to Plaintiff Semler's room); and Paragraphs 75-76 allege future harm that patients living in the new building may experience. Because these allegations do not involve Plaintiffs and some of them refer to a future harm, Plaintiffs have failed to satisfy the injury in fact requirement with respect to these allegations. Failing to establish the elements of standing for these claims, the Court has no jurisdiction over them. The Court recommends that these claims be dismissed with prejudice.

## 3. Eleventh Amendment

Plaintiffs have sued Defendants in both their individual and official capacities.[3] (See Complaint Caption.) To the extent Plaintiffs' Complaint asserts claims against Defendants for

---

[3] In addition to the fact that the Complaint caption indicates that Defendants are sued in both their individual and official capacities, the Prayer for Relief seeks compensatory and punitive damages against Defendants. (Complaint, Prayer for Relief at 38.)

actions taken in their official capacities under 42 U.S.C. § 1983, the claims must be dismissed with prejudice. The Eleventh Amendment grants a state immunity from suits brought in federal court by its own citizens, as well as citizens of another state. U.S. Const. Amend. XI; Edelman v. Jordan, 415 U.S. 651, 662-63, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 (8th Cir. 1999). A state, however, can waive its Eleventh Amendment immunity. Alsbrook, 184 F.3d at 1005. A suit against a government official in his or her official capacity is considered a suit against the entity of which the officer is an agent. Baker, 501 F.3d at 925 (citing Monell v. Dep't of Social Services, 436 U.S. 658, 690 n. 55 (1978)). The law is clear that, "the real party in interest in an official capacity suit is the governmental entity and not the named official." Baker, 501 F.3d at 925 (quoting Hafer v. Melo, 502 U.S. 21, 25 (1999)).

The Complaint alleges violations of 42 U.S.C. § 1983, the federal civil rights statute that allows citizens to seek relief for alleged violations of their federal constitutional rights. It is well-settled that in a 42 U.S.C. § 1983 action, the Eleventh Amendment precludes an award of money damages against a state official acting in his or her official capacity. Will v. Mich. Dept. of State Police, 491 U.S. 58, 66-67 (1998); Edelman, 415 U.S. at 662-63; Larson v. Kemper, 414 F.3d 936 (8th Cir. 2005). A plaintiff may maintain an action against a government official if the complaint seeks only injunctive or prospective relief. Edelman, 415 U.S. at 663; Grand River Enterprises Six Nations, Ltd. v. Beebe, 467 F.3d 698, 701-02 (8th Cir. 2006).

The State of Minnesota has not waived its immunity and consented to be sued in this case. Plaintiffs' prayer for relief seeks both monetary damages and injunctive relief. (Complaint § V at 38). Under the Eleventh Amendment, Plaintiffs cannot maintain their § 1983 action against the Defendants in their official capacities to the extent they are seeking monetary

damages. Therefore, to the extent that Plaintiffs seek monetary damages for actions taken by Defendants in their official capacities, these claims against Defendants are barred by the Eleventh Amendment and, therefore, it is recommended that they be dismissed with prejudice.

### 4. Personal Involvement

A federal official cannot be vicariously liable for the acts of his subordinates under the doctrine of respondeat superior, unless he was personally involved in, or participated in the unconstitutional acts. See Rizzo v. Goode, 423 U.S. 362, 371 (1976); Estate of Rosenberg by Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995). Defendants are liable for their personal acts only, however liability may follow if a supervisor "fails to properly train, supervise, direct or control the actions of a subordinate who causes the injury." Pearl v. Dobbs, 649 F.2d 608, 609 (8th Cir. 1981). The general responsibility of a warden for supervising the operation of a prison is not sufficient to establish personal liability. Estate of Rosenberg, 56 F.3d at 37 (citations omitted). A plaintiff must show an affirmative link between the misconduct and the adoption of any plan or policy by the defendant showing the authorization or approval of such conduct. Rizzo, 423 U.S. at 371; accord, Buford v. Runyon, 160 F.3d 1199, 1203, n.7 (8th Cir. 1998).

While Plaintiffs have made out bare allegations against certain supervisory Defendants apparently by virtue of their respective supervisory positions, they fail to state with specificity how any of these Defendants were personally involved or participated in the alleged unconstitutional acts. With respect to Defendant Benson, CEO of MSOP, Plaintiffs allege that he has hired former employees of the DOC and that he has implemented various policies and procedures to which Plaintiffs object. (Complaint ¶ 1.) Defendant Carlson, MSOP Director, is also alleged to have implemented several restrictions at issue in the Complaint, including

curfews and a one-person bathroom policy.  (Complaint ¶ 2.)  Notably, Plaintiffs have not alleged that these supervisory personnel failed to train, supervise, direct, or control the actions of any subordinate who caused injury, so that the supervisor could be directly linked to the constitutional violation.  Accordingly, it is recommended that Plaintiffs' claims against Defendants be dismissed with prejudice because Plaintiffs fail to allege any personal involvement by Defendants in the purported constitutional violations.  However, in the interest of completeness, the Court likewise concludes that Plaintiffs' claims fail on the merits, as discussed below.

### 5.    Constitutional Claims

Plaintiffs are claiming that Defendants violated 42 U.S.C. § 1983, which prohibits a person acting under color of state law from depriving another person of his or her "rights, privileges, or immunities secured by the Constitution and laws."  Section 1983 itself is not "a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).   The Court addresses the constitutional rights cited in the Complaint and whether Plaintiffs have stated claims for which relief may be granted.

### a.    First Amendment

Plaintiffs allege several violations of their rights under the First Amendment, arguing that the MSOP's media policy is unconstitutional, that Defendants have limited their access to courts, that Defendants have violated their right to privacy, violated their right to free speech, and violated their right to freely associate.

### i.    Media Policy

Plaintiffs argue that Defendants impermissibly prohibited Plaintiff Semler from receiving

nude photographs of a female friend (Complaint ¶¶ 9-10), claiming that the photos violated the

MSOP's Ban on Obscene Material. Semler went through the appeal process, was ultimately

denied relief and the photos were sent out of the facility. Plaintiff Semler contends that the

application of MSOP's Ban on Obscene Material, which states that it is in accordance with

Minn. Stat. § 246B.04, subd. 2, was unconstitutional.

MSOP is required by statute to prohibit patients from having or receiving material that is

obscene, depicts sexual conduct or is pornographic.[4]  Minn. Stat. § 246B.04, subd.2 (2008).  This

Court has previously found the MSOP media policy, and aspects of the policy embodied in

Minn. Stat. § 246B.04, facially constitutional and constitutional as applied.    Ivey v. Mooney,

05-CV-2666 JRT/FLN, 2008 WL 4527792 at *5-7 (D. Minn. Sept. 30, 2008). In Ivey,  this Court

applied a version of the test set forth in Turner v. Safley, 482 U.S. 78 (1978) (formulating a

standard of review for prisoners' constitutional claims), moderated to account for principles

stated in Senty-Haugen v. Goodno, 462 F.3d 876, 886 (8th Cir. 2006) (addressing the rights of

civilly committed persons), to a First Amendment claim brought by a civilly committed sex

offender.    Ivey, 2008 WL 4527792 at *5-7.

In Turner, the Supreme Court held that prisoners must be accorded those rights which are

not fundamentally inconsistent with imprisonment itself or incompatible with the objects of

incarceration.  Turner, 482 U.S. at 89.  In concluding that Turner applies to MSOP patients, this

Court recognized a clear conflict between "(1) maintaining an institution directed to rehabilitate

sexually dangerous persons and (2) permitting those persons to enjoy unfettered access to

materials that may impede that rehabilitation."  Id.  Turner provides that the challenged law or

---

[4] "Obscene" is defined in Minn. Stat. § 617.241, subd. 1; "sexual conduct" is defined in
Minn. Stat. § 617.241, subd. 1, and "pornographic work" is defined in Minn. Stat. § 617.246,
subd. 1.

regulation should be upheld, even one circumscribing constitutionally protected interests, so long as it is "reasonably related to legitimate penological interests." Amatel v. Reno, 156 F.3d 192, 196 (D.C. Cir. 1998) (quoting Turner, 482 U.S. at 89.)

In Turner, the Supreme Court identified several factors that a court should analyze to determine if a regulation is reasonably related to legitimate penological interests. Turner, 482 U.S. at 89. The factors a court should consider include: (1) whether there is a rational connection between the restriction and the legitimate government interest used to justify it; (2) whether alternative avenues of exercising the right remain open to the inmate; (3) whether accommodation of the right will have an adverse impact on guards, other inmates, or prison resources generally; and (4) whether obvious, easy alternatives to the restriction exist. Id. at 89-90. The Turner analysis applies equally to facial and as-applied constitutional challenges. Bahrampour v. Lampert, 356 F.3d 969, 975 (9th Cir. 2004).

Plaintiffs allege that the November 3, 2004 "Ban on Obscene Material" restricts them from possessing sexually explicit materials, or obscene or pornographic materials. (Complaint ¶¶ 9-11, Ex. 8D.) Plaintiffs further allege that the ban has "recently been revised (March/April 2008), however defendants continue to enforce the old policy. . . ." (Complaint ¶ 9.) As Plaintiffs allege, the policy in effect in 2004 is not the current policy in place at MSOP. See Ivey, 2008 WL 4527792 at *1-3 (providing background on the evolution of MSOP's prohibition on the possession of sexually explicit material). Defendants thus argue that the policies to which Plaintiffs refer are not the current MSOP policies. (DHS Defs.' Mem. Supp. Mot. Dismiss at 18, n. 4.)

The "Media Possession by Patients in the Minnesota Sex Offender Program" ("the 2007 Policy") was previously found constitutional in Ivey. 2009 WL 4527792 at *5-6. The 2007

Policy divides all media material into one of three categories: prohibited, counter-therapeutic, and permitted. Id. at *2. Prohibited materials not to be possessed by any patient include, among other things,

> 7. Any pictures, including pictures in reading materials, or videos showing close-up depictions of
>    a. sexual intercourse, including any type of vaginal, oral or anal penetration;
>    b. human genitalia in a lewd and explicit fashion;
>    c. masturbation;
>    d. excretory functions;
>    e. sexual relations between a human being and an animal; or
>    f. sadomasochistic abuse.
> 8. Pictures, videos or reading materials that, taken as a whole, promote sexual violence, child molestation, or incest or that, taken as a whole, predominantly and prominently display nudity, and have the primary purpose of sexual arousal, in a manner similar to adult oriented sexual magazines such as Playboy, Penthouse and Hustler.

Id. (citing the 2007 Policy.)

In Ivey, this Court applied the Turner factors and concluded that the 2007 Policy furthered the legitimate goals of creating an atmosphere conducive to the therapeutic goals of treating sex offenders and it reduced the danger of sexual aggression toward other civilly committed patients or staff members. This Court further noted that in light of the differing histories and needs of the MSOP population, "sorting through what should be allowed and what should not – without implementing a blanket prohibition that would eviscerate the patients' rights altogether – is inherently an imprecise and fact-specific task." Id. at *6. In those circumstances, this Court concluded that the 2007 Policy was reasonably related to its legitimate therapeutic and institutional interests. Id. As the DHS Defendants argue, such a finding is supported by other decisions in which courts have recognized rehabilitation and security as valid goals, and that a ban on sexually explicit materials can be a reasonable means of advancing those goals. Dawson v. Scurr, 986 F.2d 257, 260-61 (8th Cir. 1993); Mauro v. Arpaio, 188 F.3d 1054, 1057 (9th Cir.

1999).

Given that this Court found the 2007 Policy facially constitutional in <u>Ivey</u> and that Plaintiffs have presented no allegations which alter that conclusion, the Court recommends that the facial constitutionality of the 2007 Policy be affirmed.

As to the application of the 2007 Policy, the Court finds that Plaintiffs have failed to supply sufficient evidence of a constitutional violation, and for the reasons stated above, the policy, as applied to the images in question, satisfies the <u>Turner</u> factors. Plaintiff Semler alleges that DHS Defendants prohibited his receipt of photographs of nude female breasts and full-frontal genitalia. (Complaint ¶¶ 9-10.) The prohibition of such pictures bears a rational relationship to the therapeutic treatment goals of the MSOP, Plaintiff Semler may still receive non-prohibited media and there is no ready alternative to the policy. As an exhibit to the Complaint, Plaintiffs provide documentation of Semler's appeal, including a Media Review Team report demonstrating that at least two staff members reviewed the photographs consistent with the procedure discussed in <u>Ivey</u> before determining that the images were prohibited.[5] (Complaint, Ex. 8C.) Accordingly, the Court finds that the 2007 Policy is constitutional as applied to the images in question and recommends the dismissal of this portion of Plaintiffs' Complaint, with prejudice.

### ii. Mail Policy

Because of the inspection of their mail, Plaintiffs allege that MSOP's Mail Policy unconstitutionally interferes with their First Amendment constitutional rights. (Complaint ¶¶ 25-26.) Plaintiffs attached to their Complaint exhibits setting forth the MSOP mail room

---

[5] This documentation is consistent with the 2007 Policy discussed in <u>Ivey</u> and rebuts Plaintiffs' argument that the MSOP is applying an old policy.

procedures.  (Complaint, Ex. 13, Mail Policy of 1/3/05; Ex. 13A, Notification of Mail Returned to Sender; Ex. 13B, Memo on Mail of 4/25/2006; Ex. 13C, Memorandum on New Mail policy of 7/9/2007; and Ex. 13C-1, Patient In-House Mail of 11/14/2007.)

Regarding the inspection of incoming and outgoing mail in the context of a secure treatment facility, the Third Circuit addressed this issue in Rivera v. Rogers, 224 Fed. Appx. 148, 2007 WL 934413 (3d Cir. Mar. 29, 2007).  In Rivera, the Third Circuit likened the plaintiff's status as a civilly committed sex offender to that of a prisoner and analyzed Rivera's First Amendment claim under case law interpreting a prisoner's rights.  Rivera, Fed. Appx. at 150-51; 2007 WL 934413 at *2.  Applying the Turner factors, the court concluded that the mail policy for civilly committed persons, which provided that a designated mail officer would open all packages unless clearly marked legal mail, did not violate the First Amendment, since the special treatment unit had a legitimate interest in the safety of its facility and the rehabilitation of its patients, the policy assured that contraband was not being passed on to patients and the plaintiff was free to send and receive mail that was not sexually explicit, and there were no ready alternatives to the policy.  Id.  The court noted that Rivera remained "free to send and receive mail, including letters from his girlfriend, so long as the content of the mail he receives is not sexually explicit."  Id.

In the prison context, the Eighth Circuit has held, "It is fundamental that prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  Falls v. Nesbitt, 966 F.2d 375, 379 (8th Cir. 1992).  On the other hand, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution."  Thornburgh v. Abbott, 490 U.S. 401, 407, 109 S. Ct. 1874, 1878, 104 L.

Ed. 2d 459 (1989). Therefore, prisoners must be accorded those rights which are not fundamentally inconsistent with imprisonment itself or incompatible with the objects of incarceration. Turner, 482 U.S. at 89. "Although courts are reluctant to interfere with prison administration, allegations of deprivation of first amendment rights must be scrutinized carefully." Valiant-Bey v. Morris, 829 F.2d 1441, 1443 (8th Cir. 1987).

When determining whether a prison regulation is constitutional, a court must decide if the regulation is reasonably related to legitimate penological interests.[6] Turner, 482 U.S. at 89; Ortiz v. Fort Dodge Corr. Fac., 368 F.3d 1024, 1025 (8th Cir. 2004); Williams v. Brimeyer, 116 F.3d 351, 354 (8th Cir. 1997). Constitutional claims that would otherwise be evaluated under a strict scrutiny analysis if raised by a member of the general public, are evaluated under a lesser standard of scrutiny in the prison context. Murphy v. Mo. Dept. of Corr., 372 F.3d 979, 982 (8th Cir. 2004) (Murphy II).

Of the mail policies attached as exhibits to Plaintiffs' Complaint, the most recent policy ("the Mail Policy") provides, among other things, that "all mail and packages will be opened and inspected prior to entering the secure perimeter except legal correspondence" and that outgoing patient mail and packages will be scanned and inspected by unit staff to determine if the content is permitted by the mail policy. (Ex. 13C to Complaint, Mail – Processing Mail at MSOP Facilities, 8/10/2007.) Plaintiffs particularly challenge this inspection aspect of the policy, asserting that it was implemented as "punishment against plaintiffs and other 'patients.'"

_____

[6] In Procunier v. Martinez, 416 U.S. 396, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974), the Supreme Court's original decision regarding prisoner mail, the Court applied a strict scrutiny test to all restrictions on prisoner correspondence. However, in Turner and Thornburgh, the Court retreated from the Martinez test and adopted the more deferential "reasonably related" standard.

(Complaint ¶ 25.)

Applying the <u>Turner</u> factors to the Mail Policy, the Court concludes that MSOP has a legitimate interest in maintaining the safety of its staff and patients and the rehabilitation of its patients. The Mail Policy furthers those interests, as its goal is to prohibit patient access to contraband. (<u>See</u> Complaint Ex. 13C, 13C-1 and 15.) Patients may freely send and receive mail so long as the content of their incoming and outgoing mail does not contain contraband; thus, they maintain a means of exercising their free speech rights. Additionally, Plaintiffs do not suggest, nor do there appear to be, ready or viable alternatives to MSOP's mail inspection policy that accommodate Plaintiffs' rights while safeguarding MSOP's valid interests. The Court thus finds that the Mail Policy, both on its face and as applied to Plaintiffs, is not violative of Plaintiffs' First Amendment rights and it is therefore recommended that Plaintiffs' claims with respect to the Mail Policy be dismissed with prejudice.

### iii. Privileged Prisoner Mail/Access to Courts

MSOP's Mail Policy requires that mail inspection staff may open and inspect all mail <u>except legal correspondence</u>, which is to be opened in a patient's presence. (<u>See</u> Complaint ¶ 25) (emphasis in original.) Plaintiffs allege, without further elaboration, that their legal mail has been opened outside of their presence "on several occasions." (Complaint ¶ 26.)

The Supreme Court has long upheld the constitutionality of policies requiring that mail from attorneys to prisoners be opened in the presence of the inmates, without being read by prison officials. <u>Wolff v. McDonnell</u>, 418 U.S. 539, 577 (1974). "Privileged prisoner mail, that is mail to or from an inmate's attorney and identified as such, may not be opened for inspections for contraband except in the presence of the prisoners." <u>Jensen v. Klecker</u>, 648 F.2d 1179, 1182 (8th Cir. 1981). Claims based on the opening of a prisoner's legal mail may be analyzed as

violations of either the Sixth Amendment right to counsel, or the Fourteenth Amendment right to court access. Thomsen v. Ross, 368 F.Supp.2d 961, 974 (citing Wolff, 418 U.S. at 576).

In this case, Plaintiffs brought this claim under the First Amendment, stating that the practice of opening legal mail outside their presence "violates their Constitutional right under the First Amendment to Access to the Courts" (Complaint ¶ 26) and did not assert a claim under the Sixth Amendment. The Court recommends that this claim be dismissed with prejudice.

Under the First Amendment, the freedom to petition includes the right of access to courts, see BE & K Const. Co. v. N.L.R.B., 536 U.S. 516, 525 (2002), and the due process clause of the Fourteenth Amendment makes the First Amendment applicable to the states. Republican Party of Minnesota v. White, 416 F.3d 738, 748 (8th Cir. 2005) (citations omitted). In addition to the allegations regarding opening of legal mail outside of their presence, Plaintiffs allege that their right of access to the courts is violated by numerous policies – policies prohibiting private computers and non-MSOP "burned" CDs, limiting patient legal research computer use to one hour per day, not providing "direct access" to the courts and by maintaining a limited law library (lacking subscriptions to certain legal reporters). (Complaint ¶¶ 48, 56 .) In addition, Plaintiffs allege that they have limited access to notary public services and that telephone communications with the courts are limited to one call per month.[7] (Complaint ¶¶ 56, 58.) Defendants argue that Plaintiffs' access to courts claims should be dismissed with prejudice because Plaintiffs have not alleged an actual injury.

In Bounds v. Smith, 430 U.S. 817, 828 (1977), the Supreme Court held that the right of

---

[7] Plaintiff Semler attaches as Exhibit 9B to the Complaint a form indicating that he was denied a request to telephone the Ramsey County Court regarding his civil claim because he had previously exhausted his one-call per month limit. (Patient Request Form of 1/5/09, Ex. 9B to Complaint.)

access to the courts requires the provision of adequate law libraries or adequate assistance from persons trained in the law.  Subsequently, the Supreme Court held that an inmate alleging a violation of  Bounds must show an actual injury:

> Because Bounds did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. That would be the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary. Insofar as the right vindicated by Bounds is concerned, "meaningful access to the courts is the touchstone,"and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim.

Lewis v. Casey, 518 U.S. 343, 351(1996) (internal citations omitted).  In other words, the inmate must show that the alleged deprivations actually hindered his efforts to pursue a legal claim. Beaulieu v. Ludeman, 07-CV-1535 (JMR/JSM), 2008 WL 2498241 at *18 (D. Minn. June 18, 2008) (citations omitted).  This showing of prejudice is required of pretrial detainees, as well as prisoners.  See Thomsen, 368 F.Supp.2d at 974 (citations omitted).

Plaintiffs have not alleged any actual injury demonstrating that Defendants' actions resulted in actual harm or injury, such as the loss or rejection of a nonfrivolous legal claim regarding sentencing or the conditions of confinement.  Beaulieu, 2008 WL 2498241 at *18. Because Plaintiffs have failed to state sufficient access to courts claims, it is recommended that the DHS Defendants' motion to dismiss be granted and these claims be dismissed with prejudice.

### iv.     Right to Privacy

Plaintiffs allege that Defendants have violated their right to privacy by restricting access to suppliers of food, toiletries and nutritional supplements.  (Complaint ¶¶ 59, 60, 62.) Defendants argue that Plaintiffs' right to privacy claims should be dismissed with prejudice

because they fail under the <u>Turner</u> factors.

The Constitution does not expressly provide for a right to privacy. However, the Supreme Court has recognized that a right to privacy may exist in relation to other specifically enumerated rights. <u>See</u>, <u>e.g.</u>, <u>Stanley v. Georgia</u>, 394 U.S. 557, 565 (1969) (First Amendment protects right to read and observe what one pleases in the privacy of one's home); <u>Terry v. Ohio</u>, 392 U.S. 1, 8-9 (1968) (Fourth Amendment protects areas in which one has a reasonable expectation of privacy from unreasonable searches and seizures); <u>Katz v. United States</u>, 389 U.S. 347, 350 n. 5 (1967) (Third Amendment's prohibition against peacetime quartering of soldiers protects an aspect of privacy from governmental intrusion); and <u>Griswold v. Connecticut</u>, 381 U.S. 479, 484 (1965) (several provisions of the Bill of Rights create "zones of privacy", including the Fifth Amendment, which creates a zone of privacy that an individual cannot be forced to surrender to his detriment). Although Plaintiffs contend that the First Amendment grants them a right to privacy protecting the extent of their purchasing power, the First Amendment protects only religion, speech, assembly and petition. <u>See</u> U.S. Const. Amend. I. For this reason, the Court concludes that Plaintiffs' allegations regarding restrictions in the choice of suppliers fail as First Amendment privacy claims.

Even if the Court examined Plaintiffs' privacy claims, civilly committed persons do not possess the full range of liberties as non-confined persons. <u>See</u> <u>Senty-Haugen</u>, 462 F.3d at 886. In <u>Senty-Haugen</u>, the Eighth Circuit noted that an MSOP patient's claims of denial of access to the canteen and outside vendors constituted "de minimus restrictions 'with which the Constitution is not concerned.'" <u>Id.</u> at n.7 (citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 539 n. 20 (1979)).

Plaintiffs cite to no authority for the proposition that they have a fundamental right in the

choice of the suppliers of items to be purchased.  Attached as exhibits to the Complaint are several communications from MSOP expressing the rationale behind the property restrictions. MSOP's Property Protocol states that the policy's purpose includes "ensur[ing] the safety and security of both staff and patients."  (Complaint, Ex. 12A-1 at 2, Patient Property Protocol.)  A January 8, 2009 memorandum on the subject of patient property acknowledges that property is already limited at the Moose Lake Annex due to space issues and double occupancy. (Complaint, Ex. 12B-1, Memo of 1/8/08 from N. Johnston to Patients and Staff.)  In addition, a letter of April 14, 2008 from former MSOP Director Jack Erskine expresses that the goal in developing uniform property guidelines is "to provide patients with more flexibility in determining what property they wish to acquire, while trying to ensure MSOP remains a safe and secure therapeutic environment for both patients and staff."  (Complaint, Ex. 12B, Letter of 4/14/08 from J. Erskine to MSOP Patients.)

MSOP's restrictions on suppliers are, as stated in <u>Senty-Haugen</u>, de minimus restrictions that do not implicate constitutional rights.  Even assuming that Plaintiffs had somehow alleged  a constitutional right to privacy independently protected by the First Amendment that is implicated by restrictions in their purchasing choices, facilities may justifiably curtail their exercise of that right.  <u>See</u> <u>Turner</u>, 482 U.S. at (1987).  Defendants have a legitimate interest in the safe operation of their facility and Defendants have alternate means of purchasing items.  The Court recommends the dismissal with prejudice of this claim.

### v.      Freedom of Association

Plaintiffs allege that they and other patients are denied the right to associate with one another.  (Complaint ¶ 77.)  Defendants argue that the MSOP possesses the authority to limit the assembly of its civilly committed population, noting that Plaintiffs' First Amendment right to

freely associate "is inherently inconsistent with their involuntary commitment to the Program."

(Defs.' Mem. Supp. Mot. Dismiss at 31.)

The Supreme Court has held that prisoners do not enjoy the absolute right of freedom of association:

> The very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration. See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); Shaw v. Murphy, 532 U.S. 223, 229, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001). And, as our cases have established, freedom of association is among the rights least compatible with incarceration. See Jones, supra, at 125-126, 97 S.Ct. 2532; Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Some curtailment of that freedom must be expected in the prison context.

Overton v. Bazzetta, 539 U.S. 126, 131 (2003).

While Plaintiffs are not prisoners, they are persons civilly committed as dangerous sex offenders. Like inmates, they do not retain rights inconsistent with their status. See Senty-Haugen, 462 F.3d at 886. MSOP provides treatment to civilly committed sex offenders and, by statute, DHS must impose rules to govern the operation, maintenance, and licensure of secure treatment facilities operated by the MSOP. Minn. Stat. §246B.04, subd. 1 (2008).

MSOP argues persuasively that it must possess the ability to limit the assembly of individuals, deemed dangerous by the courts, to ensure security and order in the facility. Under Turner, the restrictions on patients' rights are reasonably related to the legitimate interest of MSOP's safety and security and Plaintiffs' right of association is not so restricted as to limit alternative means of association.

### vi. Telephone Access

Plaintiffs allege First Amendment violations based on MSOP's telephone system. (Complaint ¶¶ 12-16.) Plaintiffs, citing to a telephone policy effective in 2005, contend that they

are charged at an expensive rate, that all calls are monitored with a recordable device and that incoming calls are not permitted. (Complaint ¶ 12; Ex. 9 to Complaint.) The DHS Defendants maintain that they have a legitimate interest in monitoring and limiting patients' contacts with others in furtherance of MSOP's therapeutic goals and safety concerns. (DHS Defs.' Mem. Supp. Mot. Dismiss at 32.) In response to concerns raised about modifications to the telephone procedures, MSOP Site Director Dean Mooney stated:

> We realize that many patients consider the changes made to be inconvenient. However, we remain committed to the safety of the public, staff, and all patients, and we believe that these changes to telephone procedures are necessary in response not only to recent events but to past incidents where telephones have been used by patients to break the law or violate the rules of the facility.

(Complaint, Ex. 9, Memo of 3/31/05 from D. Mooney to MSOP Patients.)

The Supreme Court has held that "[a]ny form of involuntary confinement, whether incarceration or involuntary commitment, may necessitate restrictions on the right to free speech." Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119 (1977). In the context of civilly committed mental patients, courts have concluded that, "Institutional restrictions which implicate the constitutional rights of the criminally insane, including first amendment rights, will generally be upheld if they are reasonably related to the therapeutic interests of the patients or security interests of the institution." Martyr v. Mazur-Hart, 789 F.Supp. 1081, 1085 (D.Or. 1992) (citing Turner, 482 U.S. at 89).

This Court has held that MSOP patients do not a have a First Amendment right to a specific rate for their telephone calls. Beaulieu, 2008 WL 2498241 at *19 (citations omitted). While Plaintiffs have the right to communicate with persons outside of the Moose Lake facility, "the use of a telephone is merely one means of exercising this right." Id. As in Beaulieu, Plaintiffs here have made no allegation that they are precluded from making telephone calls

given the rate charged. Therefore, they have failed to allege a constitutional violation under the First Amendment with respect to their telephone rate claim and the Court recommends dismissal, with prejudice, of this claim.

In the prison context, numerous courts, including the Eighth Circuit, have held that an inmates' right to telephone access is subject to limitations in light of the facility's legitimate security interests. Benzel v. Grammar, 869 F.2d 1105, 1109 (8th Cir. 1989) (holding that an inmate has no right to unlimited telephone use); Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir. 1986) (holding that prisoner's right to telephone access is subject to rational limitations in light of the institution's security interests.) Numerous courts have therefore upheld various types of restrictions on inmates' telephone use. See, e.g., Canell v. Bradshaw, 97 F.3d 1458 (9th Cir. 1996) (upholding telephone system that automatically disconnects a call when the call is transferred to another line); Benzell, 869 F.2d at 1108 (holding that preventing inmates in segregated units from calling non-attorneys and non-relative males more than two times per week is reasonably related to legitimate internal security and rehabilitation concerns); Martin v. Tyson, 845 F.2d 1451, 1458 (7th Cir. 1988) (holding that monitoring of prison calls is acceptable because of legitimate security concerns); Arney v. Simmons, 26 F.Supp.2d 1288 (D. Kansas 1998) (upholding telephone system that permits recording and monitoring of calls to outside parties).

Applying the Turner factors, the fees and restrictions involving MSOP's telephone system do not violate Plaintiffs' First Amendment rights. First, monitoring telephone calls and prohibiting incoming calls is reasonably related to MSOP's security interests in detecting and preventing crimes and maintaining a safe environment. As noted in the March 2005 memo from former Site Director Mooney, quoted above, the telephone restrictions were imposed in response

to patients' telephone use that violated MSOP rules, or violated the law.[8] (Complaint, Ex. 9.)

Moreover, Plaintiffs have viable alternatives by which they may exercise their First Amendment rights. They are not prevented from having visitors or sending or receiving permitted mail and they may use the telephone pursuant to MSOP's policy. Third, accommodating patients' rights to use the telephone without any restrictions would negatively impact MSOP because patients' misuse of the telephones led to the imposition of the restrictions in the first place. In sum, the Court finds that MSOP's policies regarding telephone use do not violate Plaintiffs' rights and therefore recommends that these claims be dismissed.

### b. Fourth Amendment

Plaintiffs assert several Fourth Amendment violations against the DHS Defendants in their Complaint, alleging that they: (1) require Plaintiffs to submit to pat searches following gym use and kitchen work assignments that include removal of socks and shoes, opening their mouths, showing their zippers, showing behind their ears and running their fingers through their hair (Complaint ¶¶ 33-44); (2) require Plaintiffs to submit to unclothed visual body searches after contact visits (Complaint ¶ 42); and (3) require Plaintiffs to submit to random room searches for suspected contraband (Complaint ¶¶ 63-64).

In Bell v. Wolfish, the Supreme Court addressed the reasonableness of a search or seizure in an institutional setting, stating, "The Fourth Amendment prohibits only unreasonable searches . . .." 441 U.S. at 558. To determine "reasonableness" in an institutional setting, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." Id. In conducting this balancing test, a court must consider: (1) the scope of the

---

[8] The Court thus finds the facts of this case distinguishable from Beaulieu, 2008 WL 2498241 at *20, because here, there are sufficient facts in the pleadings for the Court to analyze the challenged state action.

particular intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted. Id. Moreover, a court must also take into account the expert judgment of officials adopting and implementing the policies at issue. Id. at 547. Bell places a "heavy burden" on Plaintiffs to show that institution officials, in initiating the policies at issue, "exaggerated their response to the genuine security considerations that actuated these restrictions and practices." Bell, 441 U.S. at 561-62. The searches challenged as unreasonable in Bell were visual body-cavity searches conducted upon detainees' re-entry to a detention facility following their contact visits with outside persons. Id. at 558. While acknowledging the high degree to which these searches might invade the detainees' personal privacy, the Supreme Court determined that the facility's security concerns outweighed the inmate's privacy interests because "[a] detention facility is a unique place fraught with serious security danger. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." Id. at 559.

The Eighth Circuit has held that involuntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches, analogous to the right retained by pretrial detainees. Serna v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009). Elaborating on the grounds for applying the standard for pretrial detainees set forth in Bell , 441 U.S. at 520, the Eighth Circuit noted that pretrial detainees are kept in custody because there is cause to believe they are dangerous; similarly, commitment under Minnesota law as a sexually dangerous person requires a finding of dangerousness. Id.

Applying the Bell test in Serna, the Eighth Circuit cautioned that "not all search techniques may be swept under the rug of deference to the detention-center decisionmakers," and considered the facts of Serna's case to present a "close question" of constitutional law. Id.,

at 955. In <u>Serna</u>, a MSOP patient challenged a facility-wide visual body cavity search after a cell phone case was found in a facility common area. <u>Id.</u> at 946. Cell phones, considered a security and treatment risk, are contraband at MSOP. <u>Id.</u> at 953. The court rejected the defendants' attempt to establish a wide-ranging rule that any suspicion of contraband is sufficient to justify facility-wide, visual body-cavity searches. <u>Id.</u> Ultimately, however, the court upheld the reasonableness of the searches, because, while invasive, they were conducted privately, safely, and professionally; the facility was reacting to a recurring problem involving contraband cell phones. <u>Id.</u> at 955-56.

Attached as an exhibit to the Complaint, MSOP's Search Policy provides that its purpose is:

> To control the entry of contraband into facilities and grounds. To prevent, discover and manage threats to the safety and security of facilities, staff, patients and the public. To prevent patients from sustaining potentially life threatening conditions as a consequence of ingesting or inserting contraband into body cavities.

(Complaint, Ex. 16D-1, MSOP Searches, 2/3/09.) The Policy also provides that searches are authorized to accomplish the purpose of the procedure and that "unnecessary force, embarrassment or indignity" will be avoided. <u>Id.</u>

### i.      Gym and Work-Related Searches

As to the searches conducted before and after gym use, Plaintiffs allege that they must submit to a full pat search, a wand search and they must remove their socks and shoes, and in connection with kitchen work, they must remove their socks and shoes. (Complaint ¶¶ 33, 38.) Plaintiff Semler alleges that during one of these gym-related pat searches, an MSOP staff member lifted his shirt, sweatshirt and shorts, revealing his skin. (Complaint ¶¶ 35-36.) When Semler objected to the search, the staff member informed him that he was conducting the search

in the manner in which he was trained. (Complaint ¶ 35.) Two other patients witnessed this particular pat search of Plaintiff Semler, which they described as "inappropriate." (Complaint ¶ 37.) After the pat search, Semler received a 30-day gym restriction for "interfering with staff while they were working." (Complaint ¶ 36.)

The gymnasium available to MSOP patients is also shared by DOC inmates of the Minnesota Correctional Facility - Moose Lake ("MCF-ML"). (See Complaint, Ex. 16, "MSOP Gymnasium Movement.") The MSOP Gymnasium Movement Policy describes how MSOP Annex patients move through a "sally port" used by both MSOP patients and DOC inmates and notes that staff will ensure that the main hallway is "clear and secured to eliminate any movement and interaction between MSOP patients and MCF-ML staff and offenders." (Id.) In describing the procedure for movement both to and from the gymnasium, the policy also states that staff will ensure that the main hallway and sally port are "free from contraband." (Id. at 3-4.)

As noted, the factors this Court must consider in evaluating the intrusion alleged by Plaintiffs include the justification, manner, location and scope of the searches. Bell, 441 U.S. at 559. This involves balancing the need for a pat search, wanding and shoe and sock removal against the intrusion upon Plaintiffs' personal rights. See Goff v. Nix, 803 F.2d 358, 364-66 (8th Cir. 1986) (applying Bell in prison context). Not only does the general MSOP Search Policy state that its overriding purpose is to control the entry of contraband and to manage and discover threats to safety (Complaint, Ex. 16D-1), the MSOP Gymnasium Movement Policy refers to the effort to eliminate contact and interaction between MSOP patients and DOC inmates (Complaint, Ex. 16), which Defendants argue, represents an effort to maintain safety and security, by eliminating the potential for patients to indirectly obtain or pass contraband. (DHS Defs.' Mem.

Supp. Mot. Dismiss at 36.)  Defendants assert, "To maintain the safety and security of MSOP patients, it is reasonable to conduct minimally-intrusive pat searches."  Id.

The Government's interest in maintaining security at institutions providing the containment and treatment of mental patients has been held crucial to safety as well as to treatment.  Morgan v. Rabun, 128 F.3d 694, 697 (8th Cir. 1997).  Here, institutional security is a proper justification for pat searches, wanding and shoe/sock removal prior to, and following, patient use of the gym and the removal of socks and shoes following kitchen work.   Moreover, there do not appear to be alternative procedures that would satisfy security concerns while limiting the amount of personal intrusion.  Although this type of search is not conducted privately, it is not highly intrusive, and is not unlike the scope of searches of the general public at airport security checkpoints.

Semler's allegations involving the staff member lifting up his shirt and pulling open his shorts, however, involve a greater amount of personal intrusion.  Two other patients, including Plaintiff Taylor, and other staff witnessed this search.  Semler voiced his objections to the search, both as it was conducted and after-the-fact.  The MSOP Patient Grievance Supervisory Review of Semler's grievance states, "Your shirt was lifted in order to gain access to your waistband.  During the pat search process staff are required to check the waistband of your clothing.  Your grievance is denied."  (Complaint, Ex. 16B, "MSOP Patient Grievance.")  After having performed a less-intrusive wand or pat search, the staff member felt it necessary to perform a more invasive search.  No facts suggest that the search was done abusively and the staff member conducting the search stated that he did so consistent with his training.  Based on these facts, the Court cannot conclude that the search was unreasonable in light of the overriding concern for security and safety.

Plaintiffs also object to the presence of security surveillance cameras in the "dish room area" of the kitchen and the dining area, where there is also staff supervision. (Complaint ¶ 38.) This type of supervision is not a constitutional violation of the Fourth Amendment. See Rojas v. Marshal Service, 2:07-CV-0325 PS, 2007 WL 4287573 at *2 (N.D. Ind. Dec. 5, 2008) (holding that pretrial detainee failed to state a Fourth Amendment claim based on use of jail's security surveillance cameras, including the surveillance of the jail shower area.) Surveillance in the kitchen work area is a reasonable measure undertaken for security and safety, involving very minimal intrusion.

In addition, Plaintiffs challenge the constitutionality of post-work searches, which include the removal of socks and shoes, pat and wand searches, and during the pat searches, patients are allegedly required to open their mouths, open the fly on their trousers, move their ears from side to side and run their fingers through their hair. As to the Bell factors involving the justification, manner, location and scope of the searches, the Court has addressed the removal of sock/shoes and pat and wand searches above, finding them minimally invasive balanced against the MSOP's underlying rationale for security and safety. Regarding the portion of the search in which patients are required to open their mouths, zippers and move their ears and hair, while more intrusive than a wand or pat search, the patients are not subject to the touching of staff to reveal these areas. Balanced against the need for safety and security following the return of MSOP patients from their work assignments, the Court does not find this type of search, in these circumstances, violates the Fourth Amendment. The Court therefore recommends that Plaintiffs' claims regarding searches before and after gym and following work assignments and the use of surveillance cameras in the kitchen be dismissed.

### ii.    Unclothed Visual Body Searches

Plaintiffs also challenge the MSOP policy requiring submission to an unclothed visual body search following visits with family, friends and attorneys.  (Complaint ¶¶ 41, 42.)  Specifically, Plaintiffs allege that they are required to "run their fingers through their hair, open their mouths and move their tongues around, raise their arms so as to expose their armpits, lift their scrotums, and to spread their buttocks so as to reveal their anus, and to raise each leg so that the soles of their feet and the area between [the] toes could be inspected, then a visual inspection of the naked body is done, including staff running a wand over their naked body."  (Complaint ¶ 42.)

MSOP's policy on patient searches provides that unclothed body searches of patients will occur when a patient is exiting from and returning to "the secure perimeter," upon initial placement in Protective Isolation or Administrative Restriction status in a Protective Isolation Area, after contact visits at the Moose Lake Annex Site, or upon reasonable suspicion with the approval of the Officer of the Day.  (Complaint, Ex. 16D-1, Minnesota Sex Offender Program Searches – Patients.)  Unclothed body searches involve the visual inspection by staff of the same gender of all body surfaces and cavities.  (Complaint, Ex. 16D-1, MSOP Searches, 2/3/09.)  MSOP's Search Policy, as previously stated, provides for such searches to control the entry of contraband, to manage security and to prevent patients from ingesting harmful substances.  (Id.)

Among the issues considered by the Supreme Court in Bell was the constitutionality of pretrial detainee strip searches conducted after every contact visit with persons from outside the institution.  Bell, 441 U.S. at 1884.  The pretrial detainees in Bell were required to expose their body cavities for visual inspection as part of the strip search.  Id.  The Supreme Court upheld the constitutionality of such searches, noting that a detention facility is uniquely fraught with serious

security dangers, including the smuggling of money, drugs, weapons, and other contraband.  Id.

Balancing the significant security interests of the institution against the privacy interests of the

detainees, the Supreme Court concluded that the searches were reasonable and did not violate the

detainees' Fourth Amendment rights.  Id. at 1885.

Applying the Bell balancing test, the Eighth Circuit has upheld policies providing for

visual body cavity searches after inmates have entered or exited a cell house after segregation

and before and after contact visits with attorneys and clergy.  See Franklin v. Lockhart, 883 F.2d

654 (8th Cir.1989) (holding that visual body cavity strip searches were justified by legitimate

security concerns which would not be furthered by less public means of searching); Goff v. Nix,

803 F.2d 358, 368-69 (8th Cir. 1986) (holding that policy permitting visual body cavity searches

of prisoners before and after visits with attorneys, clergy, and others was entitled to deference in

view of significant evidence that pre-visit searches served to protect individuals from attacks and

attempts to use them as hostages and post-visit searches served to prevent smuggling contraband

received from visitors).

Balancing the significant security interests of the institution against the privacy interests

of Plaintiffs, see Bell, 441 U.S. at 1885, the Court does not find that MSOP's policy of requiring

Plaintiffs to submit to an unclothed visual body cavity search after contact visits is

unreasonable.[9]  The policy is in place in order to maintain a safe environment, is applied only

after patients have a particular type of visit or contact, and similar searches have been upheld as

constitutional by the Supreme Court and the Eighth Circuit.  The Court recommends that

_____

[9]  The Court finds the facts here distinguishable from those in Beaulieu, where, facing a
similar Fourth Amendment claim involving strip searches at MSOP before and after transport to
the Annex and after contact visits, the Court had no facts before it, other than in the Complaint,
from which to assess the government's rationale.  Here, the exhibits to the Complaint provide the
Court with the rationale behind the policy.

Plaintiffs' claims regarding the unclothed visual body cavity searches be dismissed.

Plaintiff Taylor alleges an unconstitutional search occurred on February 27, 2006, in which a staff person, while conducting a pat search, "rubbed his hands down the crack of [Taylor's] buttocks." (Complaint ¶ 43.) Taylor filed a Patient Grievance four months later, on July 1, 2006, describing the incident. (Complaint, Ex. 16B at 4, MSOP Patient Grievance – Grievance Request.) The MSOP staff member who reviewed the grievance with Taylor stated that she talked about the fact that "per MSOP protocol, strip searches need to be conducted when there is suspicion of contraband for safety and security reasons." (Id.) At the supervisory review level, the MSOP supervisor offered to conduct additional training on procedures for unclothed body parts and reiterated that MSOP staff conducts such searches for the safety and security of all staff and patients in the facility. (Id. at 6.) While Plaintiffs appear to allege that the scope of the intrusion was too great, they allege no facts suggesting that the search occurred in an unreasonable place or that it was conducted in an abusive manner. Moreover, MSOP staff acknowledged the intrusiveness of the search, but explained that it was conducted for reasons of safety and security. For these reasons, the Court finds that this search was reasonable under Bell.

### iii.    Room Searches

Finally, Plaintiffs allege Fourth Amendment violations based on random room searches (Complaint ¶¶ 63, 64.) Specifically, Plaintiff Semler refers to three room searches, the last of which occurred on September 30, 2008. (Complaint ¶ 63.) Regarding that search, Semler's room was searched at approximately 10:15 p.m. for suspected contraband. Semler agreed to the search and observed it from the vantage point of the unit hallway. At the conclusion of the search, staff informed Semler that no contraband had been found. (Id.) MSOP's search policy

provides that "a patient's living and program areas may be searched at any time consistent with the parameters of this procedure." (Complaint, Ex. 16D-1 at 1, MSOP Searches – Patients.) Again, the stated purpose for such searches is to control the entry of contraband and to prevent, discover and manage threats to safety. (Complaint, Ex. 16D-1.)

In <u>Bell</u>, the Supreme Court upheld the constitutionality of unannounced, warrantless room searches in a facility housing pretrial detainees, stating, "It is difficult to see how the detainee's interest in privacy is infringed by the room-search rule. No one can rationally doubt that room searches represent an appropriate security measure . . .." 441 U.S. at 56-57.

The room searches at MSOP likewise do not violate Plaintiffs' Fourth Amendment rights. As in <u>Bell</u>, the MSOP is obliged to provide a safe and secure environment. Defendants also maintain that there may, in fact, be a greater need for security at the MSOP than at the pretrial detention facility in <u>Bell</u>, because the MSOP patients have been adjudicated dangerous to the public following a full hearing. The Court recommends that Plaintiffs' Fourth Amendment claims be dismissed.

### c. Eighth Amendment

Plaintiffs allege several claims under the Eighth Amendment. They contend that after the 9:45 p.m. curfew, MSOP staff force them to wait to use bathrooms if they are currently occupied (Complaint ¶ 3); that Defendants have illegally obtained waivers to permit double-bunking of patients in rooms consisting of a bunk bed, three-foot storage lockers, toilet with sink and fixed windows (Complaint ¶¶ 3, 52-55); that windows are required to be closed from October through April (Complaint ¶ 4); that staff did not appropriately respond to an outbreak of the norovirus in January/February 2007 (Complaint ¶ 6); that patients are not permitted to use bleach to launder their clothing (Complaint ¶ 5); that MSOP staff policy permits the use of mace (Complaint ¶ 7);

that the Protective Isolation policy is unconstitutional (Complaint ¶ 17); that the Identification

Count procedure, including one "stand up count" at 5:30 p.m. daily, is unconstitutional

(Complaint ¶ 18); and that Plaintiffs live in unsafe environmental conditions (Complaint ¶¶ 30,

67, 68). Plaintiffs claim that Defendants' actions and policies described above constitute cruel

and unusual punishment, in violation of the Eighth Amendment. Plaintiffs do not assert due

process violations in these counts.[10]

The Eighth Amendment applies only to persons who are in custody as punishment for a

criminal conviction. The Eighth Circuit has noted that "because an involuntarily committed

psychiatric patient is confined for treatment rather than incarcerated for the purpose of

punishment following conviction, the Eighth Amendment does not apply." Revels v. Vincenz,

382 F.3d 870, 874 (8th Cir.2004) ("because an involuntarily committed psychiatric patient is

confined for treatment rather than incarcerated for the purpose of punishment following

conviction, the Eighth Amendment does not apply.") This Court has likewise applied the Eighth

Circuit's decision in Revels, holding that the Eighth Amendment does not apply to civilly

committed persons at the St. Peter Regional Treatment Center and the MSOP Moose Lake

facility. Rousseau v. Casteneda, 08-CV-236 (DSD/JSM), 2008 WL 920448 at *2 (D. Minn.

April 3, 2008); Serna , 04-CV-615 (JMR/SRN), 2005 WL 1324090 at *5 (D. Minn. June 3,

2005), adopted, 04-CV-615 (JMR/SRN), 2005 WL 1705623 (D. Minn. July 7, 2005), aff'd, 567

F.3d 944 (8th Cir. 2009). Accordingly, the Court recommends that, with respect to Plaintiff's

---

[10] The Court notes in Paragraph 54 of the Complaint, Plaintiffs allege that placing two
patients in a room not originally meant to accommodate more than one patient is a "violation of
plaintiffs' rights to be free from Cruel and Unusual Punishment under the Eighth Amendment,
by and through the Fourteenth Amendment." Plaintiffs' acknowledgment of the Fourteenth
Amendment is understood to refer to the amendment by which other constitutional amendments
are applicable to the states, not an invocation of the Fourteenth Amendment's Due Process
Clause.

Eighth Amendment cruel and unusual punishment claims, Defendants' motions to dismiss for failure to state a claim be granted and Plaintiffs' claims be dismissed.

Further, while the DHS Defendants construe certain of Plaintiffs' Eighth Amendment counts as due process claims, and move for dismissal under a due process analysis, for several of these claims, Plaintiffs utterly fail to specify the constitutional right implicated by the state action.  (See Complaint ¶¶ 5, 7, 17, 18, 30, 55, 68.)  As they are related to claims for which Plaintiffs explicitly asserted Eighth Amendment violations, it is not unreasonable to construe them as essentially Eighth Amendment claims and recommend dismissal in light of the above ruling.  In any event, "To state a claim under section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States."  Gordon v. Hansen, 168 F.3d 1109, 1113 (8th Cir. 1993) (citing Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993)).  Because these allegations do not specify the infringed-upon right, the Court recommends that they be dismissed with prejudice for that reason as well.

### d.      Fourteenth Amendment

Plaintiffs allege several constitutional violations invoking procedural and substantive due process and equal protection.  Acknowledging that the MSOP civilly commits dangerous persons for whom the "accompanying curtailment of their liberty interests is constitutionally permissible," the Eighth Circuit has held that the nature of the constitutional rights of those committed to MSOP "must therefore be understood in the context of that commitment and its accompanying restrictions."  Senty-Haugen, 462 F.3d at 886.

In evaluating the conduct of the government in a due process claim, courts must evaluate whether the complained-of action was arbitrary:

> We have emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government," Wolff v.

> McDonnell, 418 U.S. 539 (1974), whether the fault lies in a denial of fundamental procedural fairness, see, e.g., Fuentes v. Shevin, 407 U.S. 67, 82 (1972) (the procedural due process guarantee protects against "arbitrary takings"), or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, see, e.g., Daniels v. Williams, 474 U.S., at 331 (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised).

County of Sacramento v. Lewis,  523 U.S. 833, 845-846 (1998)

### i.     Procedural Due Process

Plaintiffs assert various procedural due process violations, including the policy of requiring MSOP visitors to submit application forms prior to visits (Complaint ¶ 8); and restrictions and confiscations related to personal property, including clothing and electrical items, such as computers, electric toothbrushes and oscillating fans (Complaint ¶¶ 19–24; 47-48; 50; 75). Plaintiffs further allege a due process violation because they were recently informed that the new MSOP under construction, known as "Complex 1," will not have washing machines, dryers or refrigerators and that a patient dress code will be enforced.  (Complaint ¶ 75.)

A procedural due process claim is reviewed in two steps. Senty-Haugen, 462 F.3d at 886.  First, the court inquires into whether the plaintiff was deprived of a protected liberty or property interest.   Dover Elevator Co. v. Arkansas State Univ., 64 F.3d 442, 445-46 (8th Cir. 1995).  A protected liberty interest may arise from either the Due Process Clause itself or state laws. Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989).  If the plaintiff does have a protected interest, the court then considers what process is due by balancing the specific interest that was affected, the likelihood that the applicable procedures would result in an erroneous deprivation and the affected program's interest in providing the process that it did, including the administrative costs and burdens of providing additional process.  Senty-Haugen, 462 F.3d at 886 (citing Mathews v. Eldridge, 424 U.S. 319, 332-35 (1976)).

"In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that proper inquiry is whether those conditions amount to punishment of the detainee." Bell, 441 U.S. at 535. The Eighth Circuit has also recognized that the liberty and property interests of persons committed to state custody as dangerous persons are "considerably less than those held by members of free society." Senty-Haugen, 462 F.3d at 886. Moreover, while state statutes and regulations may give rise to constitutionally required procedural protections in certain circumstances, they "cannot dictate what procedural protections must attend a liberty interest – even a state created one." Swipies v. Kofka, 419 F.3d 709, 716 (8th Cir. 2005). Rather, due process requirements are flexible and specific to each particular situation. Senty-Haugen, 462 F.3d at 888 (citations omitted). "The most important mechanisms for ensuring that due process has been provided are 'notice of the factual basis' leading to a deprivation and 'a fair opportunity for rebuttal.'" Id. (citing Wilkinson v. Austin, 545 U.S. 209 (2005)).

No federal, state or local statute creates a property right for Plaintiffs to possess computers and electronics, electric toothbrushes, electric fans, or unlimited amounts of personal property and clothing. See Anstey v. Davis, 509 S.E.2d 579, 586 (W.Va. 1998) (holding that prisoners have no constitutional right to possess personal computers in their cells and removal of computers from cells did not constitute a taking); Sands v. Lewis, 886 F.2d 1166 (9th Cir. 1989) (holding no First Amendment right to memory typewriters). This Court has previously held that persons civilly committed to the MSOP do not have a protected due process property interest in 20-inch television sets, which were prohibited at MSOP. Beaulieu, 2008 WL 2498241 at *16 (D. Minn. June 18, 2008).

Plaintiffs allege that they were forced to store their belongings in three-foot storage

lockers, with Defendants taking anything that did not fit into the storage lockers.  (Complaint ¶¶ 19-20.)   However, Plaintiffs acknowledge that the three-foot storage locker restriction was made at the behest of the State Fire Marshall, which directed the DHS Defendants to impose this requirement out of fire hazard concerns.  (Complaint ¶ 19.)  In addition, numerous Plaintiffs' exhibits demonstrate that they were notified of the new personal property limits and the prohibition involving personal computers.  (See, e.g., Complaint, Ex. 12A-1, MSOP Patient Property Protocol; Ex. 12A-2, Moratorium on Patient Orders for New Computers and Computer Components; Ex. 12B, Temporary Property Moratorium; Ex. 12B-1, Property Memorandum; Ex. 12C, Notice and Receipt of Secured Items from Facility-Wide Search; Ex. 12C-1, Updated Property List.)

Furthermore, as reflected in the exhibits, the limitations imposed by the DHS Defendants were neither arbitrary, nor punitive, but were implemented in order to address space constraints and to further the legitimate goals of maintaining a safe and therapeutic environment.  For example, a communication regarding the Temporary Property Moratorium states, "The goal in developing these uniform guidelines is to provide patients with more flexibility in determining what property they wish to acquire, while trying to ensure MSOP remains a safe and secure therapeutic environment for both patients and staff." (Complaint,  Ex. 12B, Temporary Property Moratorium.)   As to the decision to no longer permit patient-owned computers, MSOP's Program Administrator stated:

> It was evident in the staff discussions that patient owned computers were counter-therapeutic due to many patients having used them in ways which do not fit their treatment goals.  Maintaining secretive and deceitful behaviors as well as storing and fabricating documents that have been deemed contraband are some examples.  Patients who have possessed their own computers have experienced frustration which has at times distracted them from their primary focus of treatment, which is reducing risk.

> By no longer allowing patient owned computers the program is offering an alternative. MSOP has purchased a number of computers that will be placed either on the units and/or in computer labs. We feel this will provide the opportunity for patients to still have access to computers and at the same time provide the opportunity to demonstrate pro-social behavior.

(Complaint, Ex. 18A, Nov. 14, 2007 Memo from J. Erskine to MSOP Patients.)

The Court thus concludes that Plaintiffs have not alleged a constitutionally-recognized property interest in the continued possession of unrestricted personal property sufficient to meet the threshold requirement of a deprivation of property interest.

Plaintiffs' allegations concerning the new MSOP building, "Complex 1," are purely speculative. Plaintiffs have been informed that Complex 1 will lack amenities such as washing machines, dryers and refrigerators and that a patient dress code will be enforced. (Complaint ¶ 75.) With no injury-in-fact, Plaintiffs have no standing to bring such a claim for hypothetical, future harms. The Court recommends the dismissal with prejudice of Plaintiffs' procedural due process claims.

### ii.    Substantive Due Process

Plaintiff's allege substantive due process violations involving ineffective treatment (Complaint ¶¶ 69, 72-74), physical restraint (Complaint ¶ 65), the unclothed visual body cavity searches following patient visits (Complaint ¶¶ 41-42) and a policy requiring visitors to complete application forms and submit to background checks prior to visiting MSOP patients (Complaint ¶ 8).[11] The Supreme Court has recognized the right to safe conditions, or the right to personal security, as an "historic liberty interest" protected substantively by the Due Process clause. Youngberg v. Romeo, 457 U.S. 315, 316 (1982) (citing Ingraham v. Wright, 430 U.S. 651, 673

---

[11]  The Court has also addressed unclothed body cavity searches in the Fourth Amendment section of this Report & Recommendation.

(1977)).

As to Plaintiffs due process claims of ineffective treatment, they claim that the MSOP does not provide treatment for persons committed as sexually dangerous, and, as such, the MSOP program is "detrimental to their physical, mental, emotional and psychological well-being."  (Complaint ¶¶ 69, 72-74.)

This Court has held that there is no clearly established federal right providing a civilly committed sex offender with a due process right to effective treatment.  Nicolaison v. Ludeman, 07-CV-3224 (RHK/JJG), 2008 WL 508549, *8 (D. Minn. Feb. 21, 2008) (citing Bailey v. Gardebring, 940 F.2d 1150, 1153 (8th Cir. 1991)).  In Nicolaison, this Court held that the narrow application of the Supreme Court's decision in Youngberg, which addressed the right to treatment held by civilly committed developmentally disabled persons who have no possibility of release, did not correspond to the situation of civilly committed sexual predators, who are primarily interested in release.  Id.  "Another difference is [that Youngberg] only recognized a right to 'minimally adequate' treatment that reduces the need for restraints inherent to detention. It did not consider whether there was a comparable right to treatment that facilitates release."  Id. Finding no clearly established federal law in this area, this Court held that Nicolaison could not obtain relief for his due process claim. Id.

Because this Court has not recognized a constitutional right to effective "treatment" in the context of civilly committed sex offenders, Plaintiffs have failed to allege a due process claim and the Court recommends the dismissal with prejudice of these claims.

Plaintiffs also allege a substantive due process violation based on MSOP policies that require patients to wear arm and ankle shackles when escorted off grounds and "black boxes"

when transported between facilities.[12] (Complaint ¶ 65.)

Although this Court does not find the Supreme Court's decision in <u>Youngberg</u> applicable to the question of a right to effective treatment, <u>Youngberg</u> also addressed the issue of the use of physical restraints on a civilly committed person, and the Court finds that portion of <u>Youngberg</u> authoritative here. As to the right to freedom from bodily restraint, this right always "has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." <u>Youngberg</u>, 457 U.S. at 316 (citing <u>Greenholtz v. Nebraska Penal Inmates</u>, 442 U.S. 1, 18 (1979) (J. Powell, concurring in part and dissenting in part)).

In evaluating a substantive right protected by the Due Process Clause, courts balance the liberty interest of the individual against relevant state interests. <u>Id.</u> at 321. In <u>Bell</u>, for example, the Supreme Court upheld a challenge to the pretrial detainees' confinement conditions, finding that the restrictions were reasonably related to legitimate government objectives and not tantamount to punishment. 441 U.S. at 520. As to the proper standard for evaluating the state's actions, courts consider whether professional judgment was exercised and "it is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." <u>Youngberg</u>, 457 U.S. at 321.

Only the most egregious official conduct can be said to be "arbitrary in the constitutional sense." <u>County of Sacramento</u>, 523 U.S. at 846 (citing <u>Collins v. Harker Heights</u>, 503 U.S. 115, 129 (1992)). The substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." <u>Id.</u>

---

[12] Although Plaintiffs do not further describe or define the "black box" restraint, the Court believes that Plaintiffs refer to a restraining device applied over conventional handcuffs, as described by the Eighth Circuit in <u>Moody v. Proctor</u> 986 F.2d 239, 240 n. 3 (8th Cir. 1993).

Here, Plaintiffs acknowledge that the black box policy was "apparently imposed as part of a temporary response to an escape incident" (Complaint ¶ 65). Plaintiffs received notice that they would be transported in full restraints in a July 12, 2006 memo from then-MSOP Director Jack Erskine. (Complaint, Ex. 11, Memo of July 12, 2006 from J. Erskine to All MSOP Patients.) In that memo, Mr. Erskine recognized the growth and reorganization of the MSOP program, noting that the process involved opening new facilities, staff changes, procedure revisions and modifications in the delivery of treatment. (Id.) Mr. Erskine stated, "The ultimate goal of this process is to improve program safety and create a safer, more effective treatment program for patients." (Id.) Given the rationale for the use of restraints, deemed necessary for safety reasons in light of the growth of the MSOP program, and possibly in response to an escape attempt (see Complaint ¶ 65), it cannot be said that Defendants' actions are arbitrary or shocking to the conscience.[13]

As to the unclothed body searches following patient visits with family, friends and attorneys (also challenged by Plaintiffs under the Fourth Amendment), the Court likewise finds that they do not violate due process. The purpose of the MSOP Search Policy is:

> To control the entry of contraband into facilities and grounds. To prevent, discover and manage threats to the safety and security of facilities, staff, patients and the public. To prevent patients from sustaining potentially life threatening conditions as a consequence of ingesting or inserting contraband into body cavities.

(Complaint, Ex. 16D-1, MSOP Searches, 2/3/09.) Balancing the Plaintiffs' liberty interests against the relevant state interests, see Youngberg, 457 U.S. 321, the Court finds that while such

---

[13] The Court distinguishes this case from its decision in Beaulieu, 2008 WL 2498241 at *14, where it was confined to the Complaint's allegations, which did not provide any reason or rationale for the policy. Here, because the MSOP's rationale for the use of restraints is found in exhibits attached to the Complaint (see Complaint, Ex. 11), the Court is able to conduct its analysis, concluding that Plaintiffs have failed to state a claim upon which relief can be granted.

searches are intrusive, Defendants' interest in maintaining security prevails.   For the reasons discussed herein, the Court recommends that Plaintiffs' substantive due process claims be dismissed with prejudice.

Finally, Plaintiffs allege a due process violation based on the MSOP policy of requiring family members to submit visiting application forms prior to visits with MSOP patients. (Complaint ¶ 8.)  The Visiting Privilege Application Form asks for identifying information about the prospective visitors (e.g., name, address, date of birth, relationship to patient) and asks if the prospective visitor has ever been convicted of a felony or has any criminal charges pending against them.  (Complaint, Ex. 7, Minnesota DHS Visiting Privilege Application Form.) Plaintiffs contend that the applications are then forwarded to the DOC, who conduct background checks on the proposed visitors.  (Id.)  Plaintiffs argue that, because they are not in prison, they should not be treated as such.  Viewing this process as a form of punishment, Plaintiffs therefore assert a due process violation.

As discussed above, a substantive due process violation must involve an arbitrary government action that is essentially shocking to the conscience.  Here, Plaintiffs claim that they are "punished" because family and friends must be pre-approved and subject to background checks, before they may visit MSOP.  Plaintiffs do not allege that they are prohibited from seeing all visitors or that they have suffered a delay in seeing their visitors as a result of this policy.  The Court finds no substantive due process violation.   Balancing the harm to the Plaintiffs against the governmental interest, the government's interest outweighs any perceived harm suffered by Plaintiffs in being made to feel like prisoners.  The MSOP's interest in screening its visitors for safety and security reasons is related to its objective in ensuring a safe environment for patients, staff and visitors alike.  Nor can this screening process be characterized

as arbitrary or conscious-shocking.   The Court recommends the dismissal of this claim.[14]

### iii.      Equal Protection

The Fourteenth Amendment entitles people to equal protection under the law.  See U.S.

Const. Amend. XIV.  Plaintiffs allege equal protection violations in that patients at the MSOP

Annex do not get as many work hours as MSOP patients at other facilities (Complaint ¶¶ 31-32)

and that MSOP patients, unlike DOC inmates, are required to remove their socks and shoes

during searches (Complaint ¶ 42).

In order to prevail on an equal protection claim, Plaintiffs must demonstrate that persons

who are similarly situated are treated differently by Defendants and that Defendants fail to

provide a rational basis for this differing treatment.  See Moreland v. United States, 968 F.2d

655, 660 (8th Cir. 1992); Beaulieu, 2008 WL 2498241 at * 12 ("Absent a threshold showing that

plaintiffs are similarly situated to those who allegedly receive favorable treatment, plaintiffs do

not have a viable equal protection claim.")   Once it has been demonstrated that the parties are

similarly situated, if the alleged action does not infringe a fundamental right or apply to a suspect

classification, the court applies a rational basis review.  Gavin v. Branstad, 122 F.3d 1081, 1090

(8th Cir. 1997).  Under rational basis review, the action or law will meet constitutional standards

if the dissimilar treatment is "rationally related to a legitimate state interest."  City of Cleburne v.

Cleburne Living Center, 473 U.S. 432, 440 (1985).

As to the first requirement that Plaintiffs demonstrate different treatment from others who

---

[14]  The Court notes that this same policy was challenged by an MSOP patient in Beaulieu, albeit on equal protection grounds, and this Court dismissed Mr. Beaulieu's claims.  Beaulieu, 2008 WL 2498241 at *26.  In addition to arguing that MSOP patients are not similarly situated to other civilly committed persons for equal protection purposes, the defendants also argued that the visitor policy has a rational basis given plaintiffs' close proximity to prisoners, in particular its fear that contraband will pass from patients to prisoners.  Id.

are similarly situated, this Court has held that detainees at one facility or unit are not considered similarly-situated to detainees at other facilities or units for equal protection purposes. Beaulieu, 2008 WL 2498241 at * 13; Jackson v. Wengler, 07-CV-3587 (JRT/FLN), 2007 WL 3275102 at *6 (D. Minn. Nov. 2, 2007). As Defendants have noted, civilly committed sex offenders "are not similarly situated to other civilly committed individuals housed in different [Minnesota] facilities." (DHS Defs.' Mem. Supp. Mot. Dismiss at 51) (citing Beaulieu, 2008 WL 2498241 at * 13.) Because Plaintiffs are not similarly situated to other persons housed in different facilities, their equal protection claims fail and the Court recommends their dismissal with prejudice.

### e. Statutory State and Federal Claims

Plaintiffs allege violations of various state and federal laws. For instance, Plaintiffs allege that MSOP Defendants are violating the Americans with Disabilities Act ("ADA"). (Complaint ¶¶ 31-32.) MSOP is a treatment provider and not an "employer" of its patients. Moreover, Plaintiffs do not allege a disability under the ADA. Accordingly, Plaintiffs' ADA claim fails and the Court recommends its dismissal with prejudice.

Plaintiffs also allege that Defendants should not be permitted to rely on a Minnesota statute which provides that state employees are not liable for the loss, damage or destruction of property of patients, when the DHS Defendants purposely break Plaintiffs' items, or cause those items to be destroyed. (Complaint ¶¶ 49-50) (citing Minn. Stat. § 3.76, subd. 3(m)). Plaintiffs also allege that this is a due process violation and Plaintiff Semler seeks just compensation for a broken razor. Plaintiffs apparently disagree with the Minnesota Legislature's decision to enact this provision. That disagreement, however, does not amount to a constitutional violation. To the extent that this may be construed as a claim, the Court recommends that it be dismissed with prejudice. Also, to the extent that Mr. Semler's broken razor raises a due process claim, the

Court has addressed such property claims herein, finding no constitutional violations.

Plaintiffs also allude to violations of the Minnesota Patients Bill of Rights. (Complaint ¶ 70.) As Plaintiff Semler is apparently aware, the Minnesota Patients Bill of Rights does not provide a private cause of action. Semler v. Finch, No. A06-1178, 2007 WL 1976751 *2 (Minn. Ct. App. July 10, 2007). This claim should be dismissed with prejudice.

Finally, Plaintiffs allege that the Minnesota House of Representatives considered a bill that was not passed or signed, involving a measure that proposed taking a percentage of MSOP patient earnings to be applied to costs of confinement and to a victim crime fund. (Complaint ¶ 32.) Plaintiffs maintain that if the bill passed, it would be unconstitutional as applied to them. (Id.) As Plaintiffs' injury is entirely hypothetical, the Court recommends the dismissal of this claim.

### f.    Miscellaneous Claims

 In the final portion of the Complaint, Plaintiffs allege several different claims. First, Plaintiffs allege that the grievance procedure within the MSOP is ineffective (Complaint ¶ 73) and that recommendations made by a Hospital Review Board have not been implemented (Complaint ¶ 74). Further, Plaintiffs allege that violations identified in a DHS Corrective Order of October 4, 2007 have not been corrected (Complaint ¶ 78); that DHS charges Plaintiffs, presumably to offset the cost of their room and board (Complaint ¶ 80); and Plaintiffs also assert a claim related to the billing of cable services (Complaint ¶ 45).

With respect to each of these claims, Plaintiffs fail to allege a constitutional violation that is implicated. "To state a claim under section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States." Gordon v. Hansen, 168 F.3d 1109, 1113 (8th Cir. 1993) (citing Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993)).

Because Plaintiffs' allegations do not specify the infringed-upon right, the Court recommends that they be dismissed with prejudice.

### 6. Qualified Immunity

The DHS Defendants claim that they are entitled to qualified immunity from suit. "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001) (citation omitted). Rather than a mere defense to liability, qualified immunity is an immunity from suit. <u>Id.</u> When a plaintiff claims that an officer has violated a constitutional right, "the requisites of a qualified immunity defense must be considered in proper sequence." <u>Id.</u> Viewed in the light most favorable to the party asserting injury, the threshold question is whether the alleged facts show that the officer's conduct violated a constitutional right. <u>Id.</u> at 201. If no constitutional right would have been violated were the allegations established, then qualified immunity is established. If, however, the facts support a constitutional violation, the next sequential step is to ask whether the right was clearly established. <u>Id.</u> This inquiry is fact-specific: "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> Here, as discussed above, the DHS Defendants did not violate Plaintiffs' rights. Defendants are entitled to qualified immunity.

### B. Preliminary Injunction and Temporary Restraining Order

Plaintiffs have moved for a preliminary injunction related to the conditions of confinement at MSOP, which Plaintiffs characterize as punitive, and certain practices and procedures at MSOP, including strip searches. Because the motion for injunctive relief is duplicative of the allegations in Plaintiffs' Complaint, which the Court has addressed herein in response to Defendants' Motions to Dismiss, the Court recommends that Plaintiffs' Motion for a

Preliminary Injunction be denied as moot.

As to Plaintiff Semler's Motion for Emergency Temporary Restraining Order, he avers that in the course of an in-facility move on July 28, 2009, three expandable binders full of legal work and documentation were confiscated. (Mot. Emergency TRO at 1; Aff. of Raymond L. Semler at ¶¶ 3-7, Doc. No. 44.) Staff informed Plaintiff Semler that for purposes of the move, his belongings were required to fit into property totes provided by MSOP staff. (Id.) Apparently, Mr. Semler's legal materials and pleadings did not fit into the provided containers. He claims without access to these materials, he was hindered the following day at a hearing involving his General Assistance benefits and had to request a continuance of the proceeding. Id. None of the Defendants filed a response to this motion.

This claim does not pertain to the claims currently before the Court – it involves an entirely different set of events that are not part of Plaintiffs' lawsuit. In addition, the legal proceeding for which Semler alleges harm did not involve the instant case. Plaintiff Semler may not use the mechanism of seeking injunctive relief as a means of injecting an entirely new claim into this litigation. The Court recommends that Plaintiff Semler's Motion for an Emergency Temporary Restraining Order be denied.

### C.     Additional Affidavits and Exhibits

On October 29, 2009, Plaintiffs filed seven additional affidavits or exhibits, presumably related to the pending motions. (See Doc. Nos. 57-63.) Plaintiffs did not seek the Court's permission to file the additional documents nor did Plaintiffs identify to which motions these additional exhibits and affidavits pertain. Whether these additional filings are in response to Defendants' motions to dismiss or as supplementation to Plaintiffs' motions for injunctive relief, the Local Rules do not contemplate or permit additional filings in this manner. (See LR 7.1.)

For this procedural reason, the Court will not consider the additional filings in connection with the motions addressed in this Report & Recommendation.

Moreover, the Court will not consider the additional filings on substantive grounds, as the majority of the October 29, 2009 filings relate to factual allegations not found in Plaintiffs' Complaint or they concern the rights of non-parties.[15]

### D.     Additional Motions

#### 1.     Word Limit Extension

Plaintiffs move for an extension of the word limit under Local Rule 7.1(c) in response to the Motion to Dismiss filed by Defendants Ludeman, Tesneer, Carlson and Moser. Simultaneously, Plaintiffs filed their Response in Opp'n to Defs. Ludeman, Tesneer, Carlson and Moser's Motion to Dismiss (Doc. No. 30.)  It appears that this responsive pleading may exceed the 12,000 word limit set forth in Local Rule 7.1(c), although Plaintiffs do not indicate the word length of their 39-page memorandum.  Because the Court permitted Defendants' Ludeman, Tesneer, Carlson and Moser to exceed the 12,000 word limit in their initial filing, the Court also grants Plaintiffs' Motion to Extend.

#### 2.     Removal of Claims from State to Federal Court and Voluntary Dismissal

Plaintiff Semler has filed two related motions involving a pending appeal that he has filed with the Minnesota State Court of Appeals: (1) Semler seeks to remove to federal court his state

---

[15]  Plaintiffs' October 26, 2009 Affidavit (Doc. No. 58) describes the additional exhibits. In brief, the exhibits relate to claims involving the confiscation of alleged legal mail and communication with other patients or prison inmates (Affidavit ¶¶ 2-9; 26-27; 30, Doc. No. 58); cable charges (Id. ¶¶ 10, 32;) an alleged sexual assault of another patient (Id. ¶ 12); the rationale behind strip searches and commitment to MSOP in general (Id. ¶¶ 13, 14); the policy of charging patients for a portion of the cost of their care and inmates' rate of pay (Id. ¶¶ 11, 15; 28-29); the smell in Plaintiff Semler's room (Id. ¶¶ 16-17); food sharing and adulterated food (Id. ¶¶ 18-23); and the confiscation of Plaintiff Semler's three legal binders (Id. ¶ 31).

court appeal on issues related to inmate mail; and (2) he moves to voluntarily dismiss his appeal filed with the Minnesota State Court of Appeals.

As to the voluntary dismissal, this Court has no jurisdiction over matters pending in Minnesota State Court. If Semler wishes to dismiss any action currently pending before the Minnesota Court of Appeals, he must do so in that court. His Motion for Voluntary Dismissal should therefore be denied.

Regarding Semler's removal motion, removal of a civil action from state to federal court, is addressed by 28 U.S.C. § 1441. Removal is generally sought by a defendant, not a plaintiff, and the procedure for removal is proscribed by 28 U.S.C. § 1446. Removal is not accomplished by way of motion, but requires notice and the various procedures set forth in § 1446. Because this motion is not properly before the Court, it recommends that Semler's Motion to Remove be denied.[16]

### 3. Motion for an Extension

Plaintiffs have requested additional time in which to respond to the Reply Memorandum of Law in Support of the Motion to Dismiss filed by Defendants Fabian and Hilleren. The DHS Defendants object to Plaintiffs' motion, arguing that the Local Rules do not permit a nonmoving party to file a second responsive memorandum. Prior to this Court's ruling on this issue, Plaintiffs submitted a sur-reply brief. The Court's Local Rules establish the procedure for filing and responding to motions. After a moving party files a dispositive motion, the nonmoving party may then respond, following which the moving party may file a reply. D. Minn. LR 7.1(b). The

---

[16] While the Court cannot comment on whether Semler's proposed claims would be removable if properly filed, the Court cautions Semler that if he voluntarily dismisses his state court claims, he runs the risk of having no forum for the claims should his efforts fail to either remove or add to the pending federal action.

Rules do not permit the nonmoving party to submit a memorandum responsive to the moving party's reply brief. Plaintiffs' motion should be denied and the Court will not consider any additional arguments raised therein.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.    Plaintiffs' Motion for Preliminary Injunction (Doc. No. 5) be **DENIED AS MOOT**;

2.    Plaintiffs' Motion for Temporary Restraining Order (Doc. No. 41) be **DENIED**;

3.    Plaintiffs' Motion for Extension of Word Limit in Response to Defendants' Memorandum of Law in Support of Their Motion to Dismiss (Doc. No. 31) be **GRANTED;**

4.    Plaintiffs' Motion to Remove Mail and Supplement Issue from State Court to Federal Court (Doc. No. 42) be **DENIED**;

5.    Plaintiffs' Motion to Voluntarily Dismiss Appeal (Doc. No. 43) be **DENIED**;

6.    Plaintiffs' Motion to Extend (Doc. No. 50) be **DENIED**;

7.    The Motion to Dismiss brought by Defendants Ludeman, Tesneer, Benson, Carlson and Moser (Doc. No. 23) be **GRANTED**; and

8.    The Motion to Dismiss brought by Defendants Hilleren and Fabian (Doc. No. 36) be **GRANTED**.

Dated: November 23, 2009

s/Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **December 8, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.